STATE of Missouri, Respondent,

v.

George ALLEN, Jr., Appellant.

No. 47811.

Missouri Court of Appeals,
Eastern District,
Division Two.

Nov. 20, 1984.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Jan. 7, 1985.

Application to Transfer Denied
Feb. 26, 1985.

418

John Ashcroft, Atty. Gen., Michael H. Finkelstein, Asst. Atty. Gen., Jefferson City, for respondent.

Douglas L. Levine, Public Defender, 20th Judicial Court, Union, for appellant.

SIMON, Presiding Judge.

A jury found defendant guilty of capital murder, rape, sodomy, and burglary. Judgment and sentence were assessed at life imprisonment without the possibility of parole for 50 years on the capital murder and at 15 years on each of the three remaining convictions to be served consecutively. We affirm.

Defendant claims the trial court erred: (1) in failing to exclude his confession because it was both the fruit of an unlawful arrest and also involuntarily given; (2) in permitting the state in its case in chief to present alibi testimony for one of its own witnesses, a possible suspect in the crime; (3) in permitting the state to introduce certain hearsay testimony; and (4) in submitting the case to the jury because of the insufficiency of the evidence.

On appeal, the evidence and its reasonable inferences shall be examined in a light most favorable to the state; all contrary evidence will be disregarded unless it supports the verdict. *State v. Van Doren*, 657 S.W.2d 708, 711[1] (Mo.App.1983).

Applying this standard, the following account is adduced from the evidence. Mary Bell, the homicide victim, a thirty-one year old court reporter, lived with her boyfriend, a lawyer, in her apartment at 1014b Marion in the City of St. Louis. Both had separated from their respective spouses, but neither was divorced. On Thursday, February 4, 1982, after a two day snow storm, her boyfriend awakened around 7:00 a.m., ate breakfast with Mary and left for his downtown law office around 9:00 a.m. As he left, he locked the deadbolt on the front door. Mary's next door neighbor in the adjoining apartment heard the boyfriend as he shut the front door and saw him leave the apartment around 9:00 a.m. Sometime after 10:00 a.m., the neighbor heard a woman crying and sounds of an argument between a man and a woman emanating from Mary's second floor kitchen and bedroom area. The disturbance lasted about ten minutes. Around 10:30 a.m., the same neighbor heard knocking on a door. Unable to distinguish whether it was Mary's or her front door, neighbor answered her door and saw a woman walking on the sidewalk going out from Mary's adjoining porch. Pamela Richardson, the woman the neighbor saw leaving, typed transcripts for Mary. She had called Mary sometime between 10:00 a.m. and 10:15 a.m. that morning from a downtown office. Mary interrupted their telephone conversation, explaining she had just taken a shower and needed to put on a robe. When she returned to the telephone, they agreed for Pamela, since she was already downtown and fairly close to Mary's apartment, to come to the apartment and pick up some additional tapes to type. When Mrs. Richardson arrived at Mary's house, she knocked several times and waited for Mary to answer. She knocked harder, hearing muffled bumping sounds coming from inside. She stepped back and called out Mary's name two or three times to the window above. She knocked loudly a few more times and, receiving no reply, left. She tried unsuccessfully several times later that day to reach Mary by telephone.

Mary's boyfriend had also telephoned her several times during the day but received no answer. When he arrived at the apartment around 6:00 p.m. that evening, he found the apartment door shut but unlocked. Although Mary's car was in the

parking lot, he saw no sign of her nor did she answer his calls. After a cursory perusal of the apartment without finding her, he went to the apartment manager, a good friend of Mary's, to help him figure out where Mary was. Together they looked through the apartment. Her boyfriend, after looking more carefully, discovered Mary's unclad body lying outstretched in a pool of blood in her bedroom between her bed and the wall. The police were called and discovered her throat had been cut, almost severing her head. She had died from multiple stab wounds, including fourteen stab wounds to her back. Anal and vaginal swabs from her body revealed human seminal fluid as did tests on her robe, a director's chair in the kitchen, and a pair of her pants. While no evidence of trauma to the vagina existed, an examination did show anal lacerations. Blood was found in the bedroom on the sheets, wall, and carpet. Traces of blood were also in the bathroom and on a director's chair and her robe in the kitchen. A butcher knife, recovered from inside a closet wrapped in a towel in a cooler, had only Mary's blood on it. All blood analyzed was Mary's blood type. No prints were recovered from the knife. Of twenty-seven prints found within the victim's house, twenty were identified. Nineteen of those belonged to Mary's boyfriend and one to an investigating officer. No fingerprints or microscopic fibers from Mary's house compared with those eventually taken from defendant.

Defendant was arrested at approximately 10:45 a.m. on Sunday morning, March 14, 1982, walking in the 1900 block of Park Avenue, about nine blocks from Mary's apartment, by two police officers on routine patrol in that area. Unable to produce identification satisfactory to the officers, defendant agreed to accompany the officers to the police station for further verification of his identity. While in custody, he was taken from the third district by the police officers to police headquarters for questioning by a sex offense detective around noon, followed later by a homicide officer's questioning of him.

After the homicide detective established defendant was not the man wanted for questioning in Mary Bell's murder, defendant was released. Defendant's remarks before leaving that he had been in Mary Bell's neighborhood on the day of her murder prompted the detective to detain defendant for further questioning. Defendant confessed to the murder of Mary Bell in a taped statement given to the homicide detective. In defendant's taped statement to the detective, he acknowledged that he had been at Mary's apartment complex in February, at the time of the "big snow", the day of her murder. He knocked on her door and when she opened it, forced his way in. He followed her up the stairs where she tried to hold the bedroom door shut against him. He remembered chasing her through the kitchen, also on the second floor, across from the bedroom. In the kitchen she grabbed a butcher knife, about 12 inches long. While grappling with her, he knocked it from her hand. He admitted she was stabbed during the fight and that he had sex with her on her brass bed or on the floor. While in the apartment, he heard knocks and then banging on the front door and a woman's voice calling out "Sherry" or "something like that." He thought the knocking on the door was from next door when he heard the next door neighbor open and close her door. He described Mary as white with dark hair, about 20 to 25 years old, with large breasts. Then, when shown a picture of Mary Bell, he admitted she was the woman he had stabbed and killed.

Defendant's first point contends his confession should have been excluded in response to his motion to suppress and timely trial objections, arguing that the initial warrantless arrest, resulting in his subsequent confession, was not based on probable cause. He also claims his confession was involuntary.

 The existence of probable cause for an arrest without a warrant depends on the particular circumstances and the particular offense involved, the question being determined by factual and practical consid-

eration of everyday life on which reasonable and prudent men act. *State v. Johnson*, 670 S.W.2d 882, 884[1] (Mo.App.1984). Probable cause requires a reasonable ground for belief of guilt. *Id.* In the first instance, arrest by law enforcement officers is not always required to be by warrant; rather, the question is premised upon whether a warrantless arrest was premised upon probable cause. *State v. Smith*, 588 S.W.2d 139, 142[1] (Mo.App.1979). That probable cause exists and that it must be reasonable necessarily depends upon the facts of each case. *Id.* [2]. At the heart of the question is the issue whether the two police officers who picked him up had information sufficient to warrant belief by a man of reasonable caution that defendant had committed the offense under investigation.

We now detail additional facts surrounding defendant's arrest. The two officers on routine patrol in the area of the housing projects where they arrested defendant knew there had been a rash of rapes in that area occurring on the weekends in the early morning hours. The rape suspect was described as a negro male in his early 20's, approximately 5'10", 5'11", 150–160 pounds, medium to light skinned, soft spoken and bald or shaved head. The officers also knew a man named Kirk Eaton was wanted for questioning by police concerning Mary Bell's homicide, because Eaton, a prior sexual offender, had been seen in her neighborhood several weeks prior to her murder. The officers had received an inter-departmental police memorandum with a photograph of Eaton attached, describing him as approximately 5'11", 150 pounds, negro male, early 20's, with facial hair. When the police officers drove slowly up to defendant that Sunday morning, they observed him to be approximately 5'9", 165 pounds, and in his 20's. They asked him for identification. Defendant identified himself as George Allen, Jr., that he lived in University City and was 26 years old, but could produce no identification with a photograph. Noticing that his head was shaved, as well as his eyebrows, in addition to his being soft spoken, the officers asked

defendant to accompany them to the Third District for questioning to which he agreed. Once defendant was in the car, one of the officers advised him of his *Miranda* rights.

■ At the district office the arresting officers first contacted a detective in the sex crimes unit to see if defendant was the project rapist wanted. They also compared the photograph of Rick Eaton to defendant. Unable to determine if defendant was Eaton from the four year old picture, the officers also contacted a detective in homicide who could make the identification. The officers then transported defendant to central headquarters for both the sex crimes and the homicide detectives to determine, respectively, if defendant were the project rapist or Eaton.

Defendant was originally arrested because, in the view of the two patrol officers, defendant matched the description of two different suspects wanted for questioning about crimes committed in that area. Although more than six weeks had elapsed since Mary Bell's homicide, defendant's location was in the vicinity of the rapes within the projects and the scene of Mary Bell's murder. The officers' observations of defendant's close resemblance to the two wanted suspects, especially the distinguishing feature of his shaved head, and his lack of identification and his presence in the vicinity of the crimes, constitute sufficient evidence for a prudent person to believe the defendant had committed an offense. Additionally, the officers' further observations at the station were sufficient to detain defendant at the police station; thus, his detention there was reasonable within the meaning of the Fourth Amendment. His subsequent confession was not tainted as the product of an illegal seizure of his person. *State v. Dixon*, 655 S.W.2d 547, 553[5] (Mo.App.1983).

■ On the issue of voluntariness, the state bears the burden of proving the voluntary nature of a confession by the preponderance of the evidence. The admission of a confession into evidence lies within the discretion of the trial court and the

question on appeal is whether the evidence was sufficient to sustain the trial court's finding that the statement was voluntarily given. *State v. Cole*, 657 S.W.2d 59, 62[5–6] (Mo.App.1983). The trial court's ruling on the admissibility of a confession attacked on voluntariness is not disturbed for anything short of manifest error. *Id.* [7]. Absent a showing of special circumstances, the state need only make a prima facie case of voluntariness by showing that at all stages of interrogation, the accused was advised of his constitutional rights and that no physical force, threats, or coercive tactics were used to obtain the confession. *State v. Harris*, 670 S.W.2d 526, 528[3] (Mo.App.1984). Defendant was advised of his *Miranda* rights upon his initial arrest, prior to his questioning by the sex crimes officer investigating the rapes, and prior to the interrogation by the homicide detective at department headquarters. Defendant had been in police custody less than three hours prior to his giving a taped confession. At no time did he ask for an attorney.

We have listened to his taped confession which is prefaced with a recitation of his *Miranda* rights, each of which defendant acknowledges on the tape. When the interrogating officer interrupted defendant's confession to change the tape to side two, the officer again read defendant his *Miranda* rights, which defendant again stated he understood. At the conclusion of the interview, defendant acknowledged that the statement was made of his own free will. Nothing in defendant's statement intimates he was suffering from any incompetency, mental or otherwise. At no time during his statement did he express anything indicative of coercion and the record fails to substantiate any coercion, physical or otherwise. We find no error in the admission of defendant's confession.

■■■ Defendant's second point contends that the trial court erred in permitting the state in its case-in-chief to present testimony of three witnesses corroborating the account by Mary Bell's boyfriend of his activities on the day she was murdered.

At trial, the defendant made a motion in limine to exclude the testimony of these three "alibi" witnesses which the trial court overruled. Defendant claims error in the admission of their testimony, arguing they impermissibly bolstered the boyfriend's account before his character had been attacked by the defendant.

Rule 27.02 sets forth the order of trial and pursuant thereto, parties are permitted to offer evidence in rebuttal after the state's case-in-chief and defendant's case unless the court, for good cause shown or believing that the interests of justice will be served, permits the parties to offer evidence upon their original cases. The trial court has broad discretion to control the order of proof at trial and, unless prejudice is shown, may permit the state in its case in chief to elicit evidence rebutting a defense upon which the defense avowedly intends to rely. *State v. Cameron*, 604 S.W.2d 653, 657–58, (Mo.App.1980). The present case had already been tried once resulting in a hung jury and a mistrial had been ordered. In the first trial, defendant had waited until closing argument to attack the probity of the boyfriend's testimony and to accuse him as the more likely candidate to have had the opportunity and access to kill Mary Bell, thereby hamstringing rebuttal evidence by the state. In this trial, in anticipation of defense counsel's efforts to pursue the defense that the boyfriend committed the crime in question rather than defendant, the state sought to dispel the possibility of the boyfriend's involvement. It was not an abuse of discretion for the trial court to permit the state in this instance to elicit the testimony of these three witnesses in its case in chief. Defendant is not prejudiced by the state's efforts to meet the cardinal requisite in any criminal trial, i.e. evidence establishing defendant is the person who committed the offense. *State v. McIntosh*, 546 S.W.2d 756, 758[1] (Mo.App.1977).

■■ A sub-point of defendant's argument asserts that the admission of testimony corroborating boyfriend's account was prejudicial because, while the state was

permitted to introduce evidence to dispel boyfriend's complicity to establish defendant as the killer, the state did not permit defendant to introduce evidence concerning Kirk Eaton to suggest that Eaton, and not defendant, might have been the murderer. The state made a motion in limine to bar any mention of Eaton by the defendant which the trial court granted. We find no merit to defendant's argument.

Procedurally, neither at the time of the court's ruling on the state's motion in limine did defense counsel show, by an offer of proof or otherwise, what specific questions he wished to ask and what specific evidence he wanted to elicit nor did he attempt to introduce testimony by Kirk Eaton at trial; thus, he failed to demonstrate to the trial court, and to this court on review, the propriety and admissibility of the evidence sought to be elicited and the error of granting the state's motion in limine. *State v. Cameron,* 604 S.W.2d at 659–60. At best, Kirk Eaton, a man with a prior sexual offense conviction, was known to have been in the area of the homicide several weeks prior to its occurrence and was wanted by police for questioning.

Defendant's theory was that Eaton was a likely suspect to have committed the crime. Efforts of this nature are prohibited by the rule approved in *State v. Easley,* 662 S.W.2d 248, (Mo. banc 1983), stating: "Evidence that another person had an opportunity or motive for committing the crime for which the defendant is being tried is not admissible without proof that such other person committed some act directly connecting him with the crime." *Id.* at 251–52[5]. Evidence which can have no other effect than to case a *bare* suspicion on another, or to raise a conjectural inference as to the commission of the crime by another is not admissible. *State v. LaRette,* 648 S.W.2d 96, 103[9] (Mo. banc 1983). Under this rule, defendant was not entitled to present evidence that Eaton was a suspect in the absence of proof that Eaton "committed some act directly connecting him with the crime." The trial court correctly refused to admit evidence concerning

Eaton for the sole purpose of suggesting he, and not defendant, may have been Mary Bell's killer.

Defendant's third point states the admission of testimony by Mary Bell's brother, a witness for the state, that he had argued with her before on two occasions when she had opened her door to him without first checking who was at the door was hearsay and prejudicial. The evidence is clearly relevant because it creates the inference that, since no sign of forced entry existed, Mary Bell opened the door to her attacker without first looking out, notwithstanding other testimony that she was extremely cautious about opening her door. However, the issue is not relevancy but whether the testimony should have been excluded as hearsay. "Hearsay evidence" is in-court testimony of an extrajudicial statement offered to prove the truth of the matters asserted therein, resting for its value on credibility of the out-of-court declarant. *State v. Harris,* 620 S.W.2d 349, 355[13] (Mo. banc 1981). We find that what Mary Bell's brother testified to was not hearsay. Mary's brother testified without objection that on two occasions when he had knocked on Mary's door at her apartment, he heard her run down the steps and immediately open the door. Thereafter they argued. When her brother described the argument, he never mentioned what she said. He related only: "I told her, 'Mary, what are you doing opening the door not knowing who is on the other side of the door?'" Mary's brother did not detail her comments to him. He merely described her actions when he had knocked at her apartment door, stating the subject of their argument. The evidence was properly admitted. Point denied.

Defendant's final contention is that the trial court erred in denying his motion for judgment of acquittal at the close of the state's case and at the close of all of the evidence because the evidence was insufficient to submit the matter to the jury. In reviewing the sufficiency of the evidence, we reiterate that we consider as true all of the evidence favorable to the

state's case, both direct and circumstantial, including all reasonable inferences therefrom, while disregarding all contrary evidence and its inferences. *State v. Heinz*, 607 S.W.2d 873, 881[19] (Mo.App.1980). When so viewed, we find that there was substantial evidence to support the verdict. The facts have been stated previously on this point so no lengthy repetition is necessary.

Defendant's contention appears to be based predominately on his theory that he cannot be convicted solely upon his confession, where the confession appears inconsistent and no other physical evidence linking him to the crime exists. It is true that a conviction cannot be sustained solely on the basis of an extrajudicial confession. *State v. Garrett*, 595 S.W.2d 422, 430 (Mo. App.1980). An out-of-court confession corroborated by independent evidence establishing the corpus delicti is sufficient to support a conviction. *Id.* The laceration of Mary's anus and the seminal fluids indicative of intercourse found in her vagina and anus were consistent with defendant's confession that he had sex with her and that he had sodomized her. Further, Mary's boyfriend had locked the door when he left the apartment, and on his return he found the door was shut but unlocked. This evidence, consistent with defendant's admission that she opened the door and he forced his way in, supports the submission of the burglary charge to the jury. And, lastly, on the homicide charge, the corpus delicti in a capital murder charge consists of two elements—the death of a human being and the criminal agency of another in causing the death. *State v. Tate*, 637 S.W.2d 67, 74[17] (Mo.App.1982). There can be no doubt that both these elements were met here to support submission of the homicide charge to the jury.

As to the inconsistencies in defendant's confession, evidence that Mary had just showered and that her hair was dark when wet resolves the apparent discrepancy between defendant's description of her as dark-haired although she had sandy blond hair. In addition, several points in defend-ant's confession, subsequently corroborated by evidence introduced by the state, were not known to the interrogating detective at the time defendant gave his confession. The detective did not learn Pamela Richardson had called out Mary's name when she had knocked on Mary's door until he checked with her again after defendant's statement. Defendant also related in his statement that he heard the sounds of Mary's next door neighbor opening and shutting her door. Although the neighbor had talked with detectives before the confession was obtained, she told them she did not know anything. She did not come forward and give any information to the detectives until sometime after defendant's arrest. She had moved from her apartment the day after the murder, afraid to tell the police what she knew until defendant's apprehension.

In summary, once evidence other than defendant's confession shows that the specific crimes charged were committed by someone, then the defendant's confession is admissible and, of course, if believed, completes the case. *State v. Garrett*, 595 S.W.2d at 430. And after admission of defendant's confession into evidence, it was still open to the defendant to challenge it by cross examination or by direct evidence with the objective of destroying its inculpatory effect before the jury. *State v. Diercks*, 674 S.W.2d 72, 78[9] (Mo.App. 1984). And the jury was at liberty to find that the confession was not voluntary and reject the same, but they did not.

Judgment affirmed.

STEWART and STEPHAN, JJ., concur.